UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RAMON PEREZ,

      Petitioner,

v.

SEAN MEDEIROS,

      Respondent.

Civil Action No. 1:18-cv-10158-IT

MEMORANDUM & ORDER
December 4, 2020

TALWANI, D.J.

I.    Introduction

In 2005, a jury convicted Petitioner Ramon Perez of first-degree murder for the shooting of Henry Guzman and witness intimidation. See Supplemental Answer[1] ("SA") Sentencing 10:3-23; see also Commonwealth v. Perez, 460 Mass. 683, 684-85 (2011). He was sentenced to life without parole and a consecutive 5 – 7 year sentence. SA Sentencing 22:11-17. His Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Pet.") [#1] challenges his convictions on the ground that his trial counsel was constitutionally ineffective. For the reasons that follow, the Petition [#1] is DENIED.

II.    Procedural History

In his direct appeal to the Massachusetts Supreme Judicial Court ("SJC") pursuant to M.G.L. c. 278, § 33E, Petitioner argued that his trial had been unfair in a variety of ways, including that the trial judge erred by questioning venire members about whether the

---

[1] The Supplemental Answer "has been manually filed with the Clerk of the United States District Court for the District of Massachusetts and is available in paper form only." Notice of Manual Filing [#19].

Commonwealth needed to present scientific evidence in order to prove its case and that trial counsel had been constitutionally ineffective for failing to object to that questioning.[2] SA 23-80; see also Perez, 460 Mass. at 688, 704. The SJC affirmed his conviction. Perez, 460 Mass. at 704.

On December 10, 2012, Petitioner, through counsel, filed a motion for a new trial in Essex Superior Court, SA 12, arguing that the closure of the courtroom during jury selection violated his Sixth Amendment right to a public trial and that trial counsel's failure to advise him of that right rose to the level of ineffective assistance. See Mem. & Decision on Def.'s Mot. for New Trial 2-3 [#1-1]. On November 2, 2017, Petitioner's trial motion was reassigned and, on November 24, 2017, it was denied. Id. at 2, 8. A Single Justice of the SJC, acting as a

---

[2] Petitioner also argued that the trial judge had erred by not giving the jury a Bowden instruction (that is, that "the jury could consider the lack of police investigation [and] the lack of physical evidence in determining whether there was a reasonable doubt as to the defendant's guilt"), Commonwealth v. Perez, 460 Mass. 683, 692 (2011) (internal quotations omitted), by permitting a witness to express her opinion about Petitioner's guilt, id. at 692-95, by allowing the Commonwealth to introduce evidence of Petitioner's prior bad acts as well as evidence of a telephone call between Petitioner and his estranged wife and excerpts from her diary, id. at 695-702, and by denying Petitioner's motion for a required finding of not guilty on the witness intimidation charge. Id. at 702-04. The SJC found that the trial judge did not err by omitting the Bowden instruction, id. at 693, did err in allowing the witness to give an opinion on Petitioner's guilt, id. at 694, but that the error did not prejudice Defendant, id. at 694-95, did not abuse his discretion by admitting evidence that Defendant was seen in possession of a handgun in the days surrounding the victim's murder but did err in admitting evidence of an argument Defendant had with a third party shortly before the murder was committed, which error, nevertheless, did not unduly prejudice Defendant, id. at 696-97, did not err in admitting evidence of the telephone call and did not cause a substantial miscarriage of justice in admitting the diary entries, id. 701-02, and did not err in denying Petitioner's motion for a finding of not guilty on the charge of witness intimidation. Id. at 704. Petitioner further argued that trial counsel was ineffective for failing to object to the witness's expression of her opinion about Petitioner's guilt and for failing to "adequately prepare for argument on the motion for a required finding of not guilty on the charge of witness intimidation." Id. at 704. The SJC found that there was no error in putting the witness intimidation charge to the jury and therefor the claim of ineffective assistance on that ground failed. Id. at 705. Although the court did find that failure to object to the specified testimony was error, it concluded that there was no substantial likelihood that a miscarriage of justice resulted and thus no ineffective assistance. Id.

2

"gatekeeper," then denied Petitioner's request for leave to appeal under M.G.L. ch. 278, § 33E. SA 191; Commonwealth v. Ramon Perez, No. SJ-2017-0500 (Mass. January 25, 2018).

On January 31, 2018, Petitioner, proceeding *pro se*, filed the instant Petition [#1] under 28 U.S.C. § 2254 seeking the vacation of his convictions and a new trial. He alleged five grounds for relief,[3] but his January 7, 2019 Memorandum of Law in Support of His Petition for a Writ of Habeas Corpus ("Pet'r.'s Memo") [#35] addressed only a portion of the fifth ground, ineffective assistance of counsel as the result of failure to object to the trial judge's use of the scientific evidence question during voir dire. The court considers the unbriefed grounds waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (considering it a "settled…rule," in an appellate context, "that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); Williams v. Roden, 2010 WL 2428822 at *10 (D. Mass. April 6, 2010) (Sorokin, U.S.M.J.) (finding, in the context of a *pro se* petition under 18 U.S.C. § 2254, that "[a]rguments not briefed are deemed waived").

---

[3] Petitioner alleged that: (1) the trial judge erred in questioning the venire about whether scientific evidence was required in order for the Commonwealth to prove its case (the "CSI question"); (2) the trial judge had erred by not instructing the jury pursuant to Commonwealth v. Bowden, 379 Mass. 472, 485-86 (1980), that it may consider "the lack of police investigation [and] the lack of physical evidence" when considering whether the Commonwealth has proven its case beyond a reasonable doubt; (3) the trial judge had erred by allowing the Commonwealth to introduce evidence of a privileged telephone call between Petitioner and his estranged wife and excerpts from her diary; (4) the trial judge erred by closing the courtroom during jury selection; and (5) trial counsel had offered ineffective assistance by failing to object to the CSI question, failing to object when Petitioner's girlfriend expressed an opinion about his guilt during testimony, and failing to advise Petitioner that his right to a public trial extended to jury selection and to object to the closing of the courtroom. Petition ECF 2 [#1].

III. <u>Facts</u>

  A. <u>The Murder of Henry Guzman</u>

The SJC held that the jury was warranted in finding following facts:[4]

> The defendant and the victim, Henry Guzman, had both been employed at a furniture rental center until the defendant was terminated from his job in early November, 2001; they had also engaged in drug transactions.
>
> On December 13, 2001, the night of the murder, the victim was living in Lawrence with his girl friend, Emily German, and their daughter; he arrived home from his job at approximately 9 p.m. Fifteen minutes later, he received a call on his cellular telephone, and after a brief conversation, he left the apartment, declining to tell German where he was going. He never returned. At 10:30 p.m., a Lawrence police officer engaged in a routine patrol observed the victim's empty automobile behind a supermarket distribution warehouse. A check of the registration turned up nothing suspicious, and the officer left.
>
> That same night, the defendant spent the early part of the evening at home in Haverhill with his girl friend, Michelle Chisholm, and their son. Around 8:30 p.m., the defendant had a heated, twenty-five minute telephone conversation with Kerrilee Dube, his estranged wife. After this call, he engaged in a brief telephone conversation and then told Chisholm that he was "going to meet Henry." The defendant left the apartment driving a 1996 Ford Explorer vehicle, one of two vehicles shared by the couple.
>
> The defendant and the victim communicated by cellular telephone as the defendant traveled from his apartment in Haverhill to the warehouse in Lawrence.[5] The defendant shot the victim at close range, killing him with a single

---

[4] <u>See</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); <u>Teti v. Bender</u>, 507 F.3d 50, 58 (1st Cir. 2007), <i>cert. denied</i>, 128 S. Ct. 1719 (2008) ("The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact") (internal quotation and citation omitted). Respondent adopts the SJC's version of the facts, but supplements them "with other record facts consistent with the courts' findings. <u>See</u> Opp'n 4 n.4 [#36]. Petitioner does not include a statement of the facts in his <u>Memorandum of Law</u> [#35].

[5] In a footnote, the SJC added: "Telephone records regarding calls made on December 13, 2001, show eight separate telephone calls between the defendant's cellular telephone and the victim's cellular telephone starting at 8:10 p.m. and ending at approximately 9:50 p.m. Based on expert testimony and records produced by cellular telephone companies, the early calls were connected through cellular telephone towers located near each man's apartment. Starting at approximately

gunshot to the back of the head. The defendant dragged the body down an embankment behind the warehouse.

The defendant subsequently returned to his apartment, stripped off all his clothes, and put them in a plastic trash bag. He and Chisholm drove to Plaistow, New Hampshire, in the Ford Explorer. On the defendant's instruction, Chisholm put the bag with the clothes in a trash barrel that had been set out for collection. The couple drove to a car wash where the defendant washed the vehicle, paying particular attention to the tires; the defendant and Chisholm thoroughly vacuumed the vehicle.

In the days after his disappearance, the victim's family and friends filed a number of missing persons reports and provided police with lists of telephone numbers for calls made to and from the victim's cellular telephone on December 13, 2001. The defendant's telephone number appeared on both of those lists. On December 20, 2001, the defendant was interviewed by police.[6] After that interview, he removed clothing from his closet, asked Chisholm for gloves and a shovel, and told her that "he needed to move the body" because it was in a "ditch" or under a "cliff" near a warehouse; although it could not be seen "unless you go to the edge and look down," he "needed to cover it."

On December 27, 2001, police searched the area surrounding the warehouse and discovered the victim's body under a pile of brush about twenty feet from the warehouse parking lot.[7] The body appeared to have been dragged to that location. The victim had been killed by a single gunshot wound to the back of the head with a .45 caliber projectile. Autopsy examination showed that he had been shot at extremely close range and that the shot would have rendered him immediately unconscious. Tire tracks and skid marks were observed in the warehouse parking lot near where the body was located.[8] In a later search of the area, a single .45

---

9:25 p.m., however, the tower locations changed, and the final call between the two telephones was connected through a cellular telephone tower near the warehouse in Lawrence where the victim's body was ultimately found." Perez, 460 Mass. at 686 n.1.

[6] In a footnote, the SJC added: "Police contacted the defendant by telephone on December 19, 2001. The defendant initially denied knowing the victim, but ultimately admitted that he had worked with the victim and agreed to meet with police on the following day. At the interview on December 20, the defendant admitted to speaking briefly with the victim on the telephone on December 13 about a possible job. On the day of the interview with police, the defendant changed his cellular telephone number." Perez, 460 Mass. at 686 n.2.

[7] In a footnote, the SJC added: "After learning that the victim's body had been found, the defendant removed more clothing from the couple's home. He also cleaned the couple's second vehicle, a Ford Probe automobile, removing its front floor mats and a blanket from the trunk." Perez, 460 Mass. at 687 n.3.

[8] In a footnote, the SJC added: "By the time police executed search warrants for the defendant's apartment and the two automobiles he shared with Chisholm on December 29, 2001, the Ford

caliber cartridge casing was found in the warehouse parking lot, about thirty to forty yards away from the location where the victim's body had been discovered.[9]

The Commonwealth's theory at trial was that the murder was committed in the course of a robbery. After returning to his apartment on the night of December 13, 2001, the defendant removed fourteen or fifteen "vacuum-packed" marijuana "bricks" from a shopping bag that had not been present in the apartment earlier that evening. The defendant told Chisholm he would "get rid of [the bricks] in the morning" and that he would sell them "cheaper to get rid of them faster."[10] Prior to his meeting with the victim, the defendant, who was unemployed at the time, took no money out of the joint bank account he shared with Chisholm. The next day, the defendant paid Dube one hundred dollars in weekly child support for the first time in more than a month.

While in custody awaiting trial, the defendant wrote several letters to Dube and Chisholm asking them to recant their grand jury testimony or to not testify against him at trial. Based on the letter to Chisholm, the defendant was indicted on a charge of intimidation of a witness pursuant to G.L. c. 268, § 13B.[11]

B. <u>Voir Dire</u>

The SJC's description of the relevant portion of voir dire is as follows:

At the request of the Commonwealth, the judge asked potential jurors during individual voir dire whether they believed "the Commonwealth is never able to prove a case beyond a reasonable doubt unless it presents scientific evidence to corroborate witness testimony." Thirty-eight members of the venire responded to some variation of this

---

Explorer had four new tires that had not been on the vehicle on the night of December 13, 2001." <u>Perez</u>, 460 Mass. at 687 n.4.

[9] In a footnote, the SJC added: "Ballistics examination established that the cartridge had been fired either from a semiautomatic or automatic weapon, but the ballistics expert could not determine whether the projectile that killed the victim and the cartridge casing came from the same weapon. No deoxyribonucleic acid (DNA) or fingerprints were found on the cartridge casing. The murder weapon was not recovered; however, multiple witnesses testified to seeing the defendant, both before and after the murder, with a firearm that had the characteristics of a semiautomatic or automatic weapon." <u>Perez</u>, 460 Mass. at 687 n.5.

[10] In a footnote, the SJC added: "The defendant told Chisholm that he would sell the bricks for $900 apiece. The Commonwealth's expert valued one brick of marijuana at between $700 and $1,200." <u>Perez</u>, 460 Mass. at 688 n.6.

[11] In a footnote, the SJC added: "The defendant was indicted also on a charge of witness intimidation for the letters to Dube, but that charge was dismissed by the judge prior to trial." <u>Perez</u>, 460 Mass. at 688 n.7.

>question[12] either affirmatively or ambiguously; of these, thirty-one were excused for cause.[13]…The defendant did not object to the question.

Perez, 460 Mass. at 689.[14]

IV.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a person in custody pursuant to the judgment of a state court must have "exhausted the remedies available in the courts of the State" prior to filing a petition for a writ of habeas corpus in the federal court. 28 U.S.C. § 2254(b)(1)(A). Petitioner's claim of ineffective assistance as the result of failure to object to the trial judge's use of the scientific evidence question during voir dire was raised on direct appeal and so has been properly exhausted.

A federal court reviewing a properly exhausted claim will grant relief only where the prior adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An ineffective assistance of counsel claim is a mixed question of law and fact, Strickland v. Washington, 466 U.S. 668, 698 (1984), such that Petitioner must demonstrate that

---

[12] In a footnote, the SJC added: "The judge also asked variants such as: 'Would you agree or disagree with this statement? In order to prove its case beyond a reasonable doubt, the Commonwealth always has to produce scientific evidence.' The judge sometimes asked follow-up questions as well, such as: 'If the Commonwealth did not produce scientific evidence, would you feel required to return a verdict of not guilty?'" Perez, 460 Mass. at 689 n.8.

[13] In a footnote, the SJC added: "Of the thirty-one jurors who were excused for cause, twenty-four were excused based on their answers to the question, and seven were excused for other reasons or because of a combination of factors including their answers to the scientific evidence question." Perez, 460 Mass. at 689 n.9.

[14] The complete transcript can be found in SA volumes 1 and 2.

the state court's decision was an unreasonable application of clearly established Federal law. See Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) (citing Terry Williams v. Taylor, 529 U.S. 362, 409 (2000) (mixed questions are reviewed under § 2254(d)(1)'s "unreasonable application" clause)).

A state court decision involves an "unreasonable application" of established law where "it correctly identifies the governing legal rule but applies that rule unreasonably to the facts" in front of it in a manner "so lacking in justification" that it is "beyond any possibility for fair-minded disagreement." White v. Woodall, 134 S. Ct. 1697, 1702, 1706 (2014). The state court must have made more than a "clear error." Id. at 1702. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Harrington v. Richter, 562 U.S. 86 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Counsel is constitutionally ineffective where the "representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id at 694.

On direct appeal pursuant to M.G.L. c. 278, § 33E, the SJC reviews unpreserved claims of error, including ineffective assistance claims, to determine "whether there is a substantial likelihood that a miscarriage of justice has occurred." Commonwealth v. Wright, 411 Mass. 678, 681-82 (1992); see also Perez, 460 Mass. at 704 ("In cases involving review pursuant to G.L. c. 278, § 33E, claims of ineffective assistance of counsel are reviewed under the more favorable 'substantial likelihood of a miscarriage of justice' standard"). The First Circuit has held that, pursuant to 28 U.S.C. § 2254(d), application of the "substantial likelihood of a miscarriage of

justice" standard in evaluating an ineffective assistance claim is not "contrary to" Federal law as laid out in Strickland.[15] Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006).

V.   Discussion

Petitioner argues that trial counsel's failure to object when the judge questioned venire members about the necessity of scientific evidence constitutes ineffective assistance of counsel. Pet'r.'s Mem. 2 [#35]. On direct appeal, Petitioner argued further that the scientific evidence questions asked of the venire deprived him of his Sixth Amendment right to an impartial jury. Because trial counsel did not object to the questioning, the SJC conducted the "miscarriage of justice review" appropriate in instances of unpreserved error. See Perez, 40 Mass. at 689. The court determined that "the trial judge did not abuse his discretion" because the questions "were tailored to ensure that seated jurors were capable of deciding the case without bias and based on

---

[15] In fact, the "miscarriage of justice" standard is more favorable than Strickland. The SJC has explained that:

> if a defendant convicted of murder in the first degree is unable to show on his direct appeal that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel. In other words, the statutory standard of § 33E is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel.

Commonwealth v. Wright, 411 Mass. at 682 (1992). Put differently, the SJC's "miscarriage of justice standard" is more favorable than the Federal constitutional ineffective assistance standard articulated by the SJC in Commonwealth v. Saferian, 366 Mass. 89, 96, (1974). See Commonwealth v. Wright, 411 Mass. 678, 682 n.1 (1992) ("In reviewing an appeal under G.L. c. 278, § 33E, from a conviction of murder in the first degree, we consider each argument that a new trial or a verdict of not guilty is required because of a claimed error that is said to have created a substantial likelihood of a miscarriage of justice…Once we have performed those functions, our special powers of review under § 33E are no longer applicable. Any claim of ineffectiveness of counsel presented in a subsequent appeal from the denial of a motion for a new trial, authorized by a single justice of this court, would not be tested under the § 33E standard but on the applicable constitutional standards, State and Federal"). The First Circuit has held that an analysis conducted pursuant to Saferian is "a functional equivalent" to an analysis under Strickland. Ouber v. Guarino, 293 F.3d 19, 44 (1st Cir. 2002). Thus, the § 33E "miscarriage of justice" review is more favorable than the Strickland standard.

the evidence," "did not suggest to potential jurors that a lack of scientific evidence could not be considered in determining whether a reasonable doubt existed as to the defendant's guilt," "did not commit the jury to a verdict in advance," and, "as posed, did not have the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present." See id. at 691. When the SJC subsequently examined Petitioner's ineffective assistance claim for failure to object to that same questioning,[16] it found that where "there was no error in the judge's decisions to permit the scientific evidence question…a claim of ineffective assistance of counsel on [that] ground[] must also fail." Perez, 460 Mass. at 704; see also Wright 411 Mass. at 682 ("[I]f a defendant convicted of murder in the first degree is unable to show on his direct appeal that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel"). In finding that the failure to object to his questioning did not rise to the level of ineffective assistance of counsel where the trial judge acted within his discretion on voir dire, the SJC reasonably applied its own "miscarriage of justice" standard, which is more generous than the clearly established Federal law elucidated in Strickland.

However, Petitioner contends that the SJC's underlying determination that the judge did not abuse his discretion in his questioning of the venire was based on an unreasonable determination of the facts,[17] namely, an incorrect understanding that no scientific evidence was

---

[16] The SJC assessed Petitioner's ineffective assistance claim pursuant to the § 33E "miscarriage of justice" standard. Perez, 460 Mass. at 704

[17] Petitioner makes his argument on the "unreasonable determination of the facts" standard pursuant to 28 U.S.C. § 2254(d)(2). Pet.'s Memo 9, 11 [#35]. Respondent contends that, because jury instructions can be subject to de novo review on appeal, the appropriate inquiry here is instead whether the SJC unreasonably applied clearly established Federal law pursuant to 28 U.S.C. § 2254(d)(1). Opp'n 16-17 n.13 [#36] (citing U.S. v. Teemer, 394 F.3d 59, 63 n.2 (1st

introduced at trial. Pet.'s Memo 11 [#35]. In support of this argument, Petitioner quotes Commonwealth v. Gray, 465 Mass. 330, 338 (2013), which in turn cites Perez, 460 Mass. 683, for the proposition that the SJC had already considered "whether a trial judge has abused his discretion by asking members of the venire if they believe that they will be able fairly to evaluate the Commonwealth's evidence notwithstanding the absence of scientific evidence such as DNA or fingerprints." Petitioner argues that "there was no absence of scientific evidence" in his case, "only the absence of scientific evidence connecting [him] to the crime," but that the SJC's finding that the trial judge did not abuse his discretion in his questioning of the venire "was based on the absence of scientific evidence." Pet'r.'s Mem. 11 (emphasis omitted).

Notwithstanding Gray's citation to Perez, the SJC explicitly did not reject Petitioner's appeal based on an assessment that there was a complete "absence" of scientific evidence. Perez, 460 at 691. Rather, the SJC found that the judge's questions at voir dire "did not suggest to potential jurors that a lack of scientific evidence could not be considered in determining whether a reasonable doubt existed as to the defendant's guilt." Id. at 691; see also id. at 691 n.13 ("We have considered, in connection with our review under G.L. c. 278, § 33E, whether the scientific evidence questions, in effect, instructed the jury that they could not consider a lack of scientific evidence in determining whether a reasonable doubt existed as to the defendant's guilt, or otherwise undermined a Bowden defense, and conclude that they did not").

---

Cir. 2005) for the proposition that "[w]hether an instruction should have been given can involve abstract questions of law reviewed de novo"). However, where the SJC based its determination that the judge's questions on voir dire did not constitute an abuse of discretion in part on the assessment they "did not have the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present," the court reviews the SJC's assessment of the evidence presented at trial for an unreasonable determination of the facts. Petitioner has not asserted that the SJC's use or application of the abuse of discretion standard in its review of the trial judge's voir dire was contrary to or an unreasonable application of clearly established Federal law.

11

Moreover, it is clear that the SJC properly understood what evidence was and was not offered at trial when it assessed whether the trial judge abused his discretion at voir dire. The SJC described the available scientific evidence as comprising "[a]utopsy evidence" indicating that the victim had been shot at close range by a .45 caliber bullet, and "a single .45 caliber cartridge casing…found in the warehouse parking lot" on which "[n]o deoxyribonucleic acid (DNA) or fingerprints were found." 460 Mass. at 687, 687 n.5. No murder weapon was ever recovered, and, although "[b]allistics examination established that the cartridge had been fired either from a semiautomatic or automatic weapon, [] the ballistics expert could not determine whether the projectile that killed the victim and the cartridge casing came from the same weapon."[18] Id. at 687 n.5. The SJC also detailed the apparent efforts made by Petitioner to destroy forensic evidence, such as removing clothing from his home, id. at 687 n.3, changing the tires on one of his two cars, id. at 687 n.4, and removing the floor mats and a blanket from the trunk of the other. Id. at 687 n.3. This is a reasonable summary of the scientific evidence presented at trial,[19] which as Respondent noted, "was inconclusive as to [Petitioner's] involvement in Guzman's murder." Opp'n 15 [#36].

---

[18] Petitioner contends that "scientific evidence pertaining to chemical analysis, DNA testing, fingerprints, and ballistics" was presented at trial. Pet'r's Mem. 11 [#35].

[19] The court has reviewed the testimony of David Mahan, SA 6:179-198 (explaining that the fingerprint found on the rear view mirror of the victim's Dodge Colt was not a match with either the victim or Defendant, that the cartridge casing did not reveal any fingerprints, and that no tire tread comparison was made with the tire marks found at the scene), Michael Coleman, SA 7:71-93 (explaining that he recovered a .45 auto-caliber discharged cartridge casing from the scene, which he sent to be fingerprinted and tested for DNA, that he examined fragments of a .45 caliber bullet received from Trooper Barry Brodette and determined that it was "fired from a weapon which utilized a rifling system of six lands and six grooves with a direction of right twist" but that he was never asked to compare it against a specific weapon and that it was not possible to say whether the bullet fragments had been fired from the recovered casing), Paul Zambella, SA 6:213-238 (explaining that no blood was found in Defendant's apartment, that he recovered a sample of the blood stain on the door panel of Defendant's Ford Probe and sent it for DNA analysis, that Defendant's Ford Explorer was "exceptionally clean," and that he examined

Having reviewed the record, it appears the SJC correctly understood the evidence presented at trial and did not assess the propriety of the trial judge's voir dire "based on an unreasonable determination of the facts." See 28 U.S.C. § 2254(d)(2); see also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (A state court decision is "based on an unreasonable determination of the facts" if it is "objectively unreasonable in light of the evidence presented in the state-court proceeding"). As such, the SJC's related holding, that counsel was not constitutionally ineffective for failing to object to the trial judge's scientific evidence questions, is not based on an unreasonable interpretation of the law.

VI.  Conclusion

For the foregoing reasons, Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody [#1] is DENIED.

IT IS SO ORDERED.

Date:   December 4, 2020                          /s/ Indira Talwani
                                                  United States District Judge

---

the clothing taken from the victim and found nothing that warranted further testing), and Kristen Sullivan, SA 6:200-212 (explaining that the DNA profile obtained from the red-brown stain on the door panel of Defendant's Ford Probe did not match the victim's DNA profile, and that there was no detectable DNA recovered from the cartridge casing).